EVAN R. MOSES, CA Bar No. 198099
evan.moses@ogletree.com
ALEXANDER M. CHEMERS, CA Bar No. 263726
alexander.chemers@ogletree.com
MELIS ATALAY, CA Bar No. 301373
melis.atalay@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA  90071
Telephone:  213-239-9800
Facsimile:   213-239-9045

Attorneys for Defendant
FEDEX GROUND PACKAGE SYSTEM, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNEST CUADRA, on behalf of himself and others similarly situated,<br><br>          Plaintiff,<br><br>    v.<br><br>FEDEX GROUND PACKAGE SYSTEM, INC., a Delaware corporation; FEDEX, a business entity unknown; and DOES 1 to 100, Inclusive,<br><br>          Defendants. | Case No. 2:20-cv-10719-JFW (SKx)<br><br>**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>[Filed concurrently with Declarations of Alexander M. Chemers and Robert Crandall, MBA; Response to Trial Plan; Response and Objections to Declaration of William Roberts, Ph.D.; Compendium of Evidence]<br><br>Date:        August 16, 2021<br>Time:        1:30 p.m.<br>Place:       Courtroom 7A<br><br><br>Complaint Filed: December 3, 2019<br>Trial Date:      December 14, 2021<br>District Judge:  Hon. John F. Walter<br>                Courtroom 7A, First St.<br>Magistrate Judge:Hon. Steve Kim<br>                Courtroom 540, Roybal |

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION .................................................................................. 1

II.     STATEMENT OF FACTS ....................................................................... 3

    A.     There Is No Common Policy That Requires Security
        Checks ........................................................................................ 3

    B.     There Is No Common Evidence Showing Which
        Employees Undergo Security Screening ........................................ 4

        1.     There Are Material Differences Between Facilities ........... 4

        2.     There Are Material Differences Within The Same
            Facility .......................................................................... 5

    C.     There Is No Common Evidence Tracking The Time It
        May Take To Go Through Security ............................................... 6

    D.     FXG Pays For Potential Security Screening Time ......................... 7

    E.     FXG's Lawful Meal And Rest Break Policies ............................... 7

    F.     Plaintiff Ernest Cuadra .............................................................. 9

III.    PLAINTIFF'S CLAIMS ARE NOT CERTIFIABLE .............................. 10

    A.     Plaintiff Fails To Establish Either Commonality Or
        Predominance For The Security Check Claim. ........................... 11

        1.     There Is No Common Proof Of A Mandatory
            Security Screening Process. ........................................... 11

        2.     No Common Proof That Potential Security Screens
            Resulted In Compensable Time. ..................................... 14

        3.     Security Check Payments Do Not Solve These
            Evidentiary Shortcomings And Only Increase The
            Individualized Issues. ................................................... 15

    B.     Plaintiff's Meal Period Claim Should Not Be Certified. ............. 17

        1.     The Claim Fails Without A Uniform Screening
            Policy. .......................................................................... 17

        2.     There Is No Common Evidence That Meal Periods
            Were Exactly 30 Minutes. .............................................. 18

        3.     There Is No Common Evidence That Meal Periods
            Lasting 30 Or Fewer Minutes Were Shortened By
            Security Checks. ............................................................ 18

        4.     There Is No Common Evidence That Employees

i

Were Discouraged Or Impeded From Leaving The Premises. ........................................................................... 19

C.   Plaintiff's Rest Period Claim Should Not Be Certified. ............. 21

D.   Plaintiff's Wage Statement Claim Should Not Be Certified. ........................................................................... 22

E.   Plaintiff's Final Wages Claim Should Not Be Certified. ............. 22

F.   There Is No Evidence To Determine Who In The Proposed Classes Are Injured. ........................................... 23

G.   Plaintiff Offers No Method To Manageably Try This Case. ..................................................................................... 24

IV.   CONCLUSION ................................................................................ 25

47939461_3.docx

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Coates v. United Parcel Serv.*,
2019 WL 8884492 (C.D. Cal. July 2, 2019) ........................................24

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .................................................................................25

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ................................................................25

*Greer v. Dick's Sporting Goods, Inc.*,
2017 WL 1354568 (E.D. Cal. Apr. 13, 2017) ......................................13

*Hamilton v. Wal-Mart Stores, Inc.*,
2018 WL 4813082 (C.D. Cal. Aug. 21, 2018) ......................................20

*Hamilton v. Wal-Mart Stores, Inc.*,
2019 WL 1949457 (C.D. Cal. Mar. 4, 2019) .................................19, 20

*Heredia v. Eddie Bauer LLC*,
2020 WL 127489 (N.D. Cal. Jan. 10, 2020) ........................................13

*Hubbs v. Big Lots Stores, Inc.*,
2017 WL 2304754 (C.D. Cal. May 23, 2017) ......................................13

*Lewis v. Casey*,
518 U.S. 343 (1996) ..............................................................................16

*Nevarez v. Costco Wholesale Corp.*,
2019 WL 7421960 (C.D. Cal. Dec. 26, 2019) ..........................13, 17, 22

*Ogiamien v. Nordstrom, Inc.*,
2015 WL 773939 (C.D. Cal. Feb. 24, 2015) ..................................13, 14

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*,
993 F.3d 774 (9th Cir. 2021) ....................................................10, 11, 23

*Quinlan v. Macy's Corp. Servs., Inc.*,
2013 WL 11091572 (C.D. Cal. Aug. 22, 2013) ...................................13

*Rodriguez v. Taco Bell Corp.*,
896 F.3d 952 (9th Cir. 2018) ................................................................14

*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) ................................................................25

*Trevino v. Golden State FC LLC*,
2021 WL 2328414 (E.D. Cal. June 8, 2021) ................................*passim*

*Troester v. Starbucks Corp.*,
2020 WL 553572 (C.D. Cal. Jan. 27, 2020) ........................................15

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016)...................................................................................23, 25

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ...................................................................................13, 25

*Zinser v. Accufix Research Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001) ................................................................24

**California Cases**

*Augustus v. ABM Security Servs., Inc.*,
  2 Cal. 5th 257 (2016)...................................................................................22

*Brinker Rest. Corp. v. Sup. Ct.*,
  53 Cal. 4th 1004 (2012)..............................................................................19

*Morillion v. Royal Packing Co.*,
  22 Cal. 4th 575 (2000)...............................................................................14

*Troester v. Starbucks Corp.*,
  5 Cal. 5th 829 (2018).................................................................................15

47939461_3.docx

## I.      **INTRODUCTION**

Based solely on his own experiences and without a single declaration from another employee, plaintiff Ernest Cuadra ("Plaintiff") seeks to represent over 67,000 non-parties who worked at more than 40 locations in California.  Plaintiff, who demands $350,000,000 in damages,[1] ignores Rule 23's stringent standards, including the requirement that he establish predominance by a preponderance of evidence.

Plaintiff's claims relate to alleged security checks at facilities operated by FedEx Ground Package System, Inc. ("FXG").  Although his Motion proclaims that "uniform policies" mandate a search "every time" employees enter or exit facilities, the evidence does not bear this out.  FXG's policies provide potential methods that local facilities "may" choose to implement; whether a screen occurs, to whom it applies, and what it involves varies by location.  Dozens of declarations submitted by FXG prove this: employees attest that their facility had no security process, that the process did not apply to certain employees or certain shifts, that it changed over time, or that it otherwise did not impact them.  Because there is no uniform policy mandating security checks, there is no "glue" holding together the proposed class.

The security check theory would fail even if Plaintiff could identify a uniform policy, since Plaintiff must still show through common evidence that security checks result in uncompensated time for 67,000+ employees.  He cannot do so generally, and particularly because FedEx Ground has also paid, to many of its employees, flat amounts for the time it may take to go through security.  Those flat amounts vary by location and timeframe.  Thus, a factfinder cannot determine which employees may have unpaid wages without an examination of: (1) whether the employee underwent security check; (2) how long the security check took; and (3) whether FXG's flat pay exceeded the amount of compensation owed for security check time.  These highly individualized determinations must be made for each employee and for each day worked.  Plaintiff's Motion proves he has no common proof to establish any of these

---

[1] Compendium of Evidence ("CE") 7, Roberts Dep. 171:4-22.

47939461_3.docx

liability questions.  Plaintiff instead relies on a single declaration alleging that—in the 8 weeks and at the single location that he worked during the relevant period—the security process personally took <u>him</u> 6-to-10 minutes to navigate.  He has not shown that his experiences are shared by the 99.998% other putative class members whom he seeks to represent.  FXG submits declarations from 66 employees and 21 locations showing that the security process takes no time or a few seconds, confirming that employee experiences with security checks vary wildly.

Plaintiff's secondary claims are even less suitable for class treatment.  He contends security checks "shortened", "impeded or discouraged" meals and breaks.  This flawed theory presupposes FXG has a uniform policy requiring all employees to go through security processes; it does not.  Plaintiff's testimony—including that he regularly took meal breaks off premises and for more than 30 minutes—further establishes the individualized nature of his allegations.  Dozens of putative class members confirm that they were not discouraged or impeded from leaving FXG's facilities either, and that they could—consistent with FXG's written policies—choose to extend their meal and rest periods to offset any potential security check time.  Thus, it is impossible to determine whether liability exists without a myriad of individualized inquiries, including (1) the length of the meal and rest break taken; (2) whether the employee chose to take a short break; (3) whether the employee chose to leave the premises for the break and why; (4) whether the employee underwent a compensable security screen; and (5) whether the screening time (if any) caused the break to dip below the legal minimums.  There is no common method to answer these inquiries, let alone for <u>each break</u>, for <u>each employee</u>, and for <u>each day</u>.

In sum, Plaintiff presents a morass of fact-intensive and individual determinations.  None of these critical liability questions can be resolved through common evidence.  Plaintiff's anemic "trial plan" further reinforces that a class action is not manageable or superior.  Plaintiff's Motion for Class Certification should be denied.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

47939461_3.docx

## II.     STATEMENT OF FACTS

FXG is a federally registered motor carrier that offers the pickup and delivery of packages throughout the United States.  It operates over 40 work facilities in California, whose scale of operations vary widely.  CE1 Winston ¶¶ 2-3.  While Loc. #12[2] operates 24/7, with up to 650 employees working one of four shifts, there are only 14 employees and one shift at a smaller facility like Loc. #17.[3]

Plaintiff's proposed class includes dozens of job types, including package handlers, office administrators, and operations managers.  Package handlers have shifting start and end times depending in part on package volume; office administrators, by contrast, tend to work more regular hours.[4]

### A.     There Is No Common Policy That Requires Security Checks

Plaintiff's Motion does not identify a uniform policy requiring security screens at all of FXG's facilities.[5]  That is because no such policy exists.  Rather, because each local facility has its own distinct operations that may impact potential security needs, FXG's written guidelines provide a flexible approach.

Plaintiff's Motion cites to three written guidelines that pertain to security: (1) SEC-306; (2) Policy-018; and (3) Contract Security Post Orders.  Mot. 4:16-5:10.  SEC-306 states "all individuals entering or exiting a FedEx Ground station or hub may be subject to security screening."  It does not mandate that local facilities must

---

[2] Due to security concerns, FXG has replaced place names with generic location numbers ("Loc. #").  Through a Joint Application to Seal (ECF 81-82), FXG has supplied the Court with a chart that matches location numbers to specific locations.
[3] *Compare* CE75 **L. Rodriguez** ¶3 *with* CE74 **Drossel** ¶3.
[4] CE1 **Winston** ¶¶4-6; *see also, e.g.*, CE9 **Andrade** ¶4; CE21 **Chavira** ¶4; CE32 **Givens** ¶4; CE50 **Monje** ¶4; CE55 **Owens** ¶3.
[5] Plaintiff's Motion erroneously contends FXG has "a mandatory 'Security Screening' process for employees exiting and entering work at numerous California warehouse facilities."  Mot. 3:23-27.  In support, the Motion cobbles together 17  snippets from the deposition of FXG's security PMK, Steven Ward.  *Id.*  In the cited testimony, Mr. Ward merely testified that the written procedure (SEC-306) does not require facilities to have security screening.  It instead states that if a particular local facility has a screening process, employees should comply with that process.  CE5 (Ward Dep. 90:13-16, 93:8-19).  The remainder of the cited testimony is mostly comprised of hypotheticals about screening which may not apply.  *See, e.g.*, *id.* at 152:5-22 ("If a facility has screening, then the screening procedure would apply").

use security screenings, let alone direct which security methods must be used. Rather, SEC-306 outlines potential methods that "may be" used, including a walkthrough metal detector, a handheld metal detector (*i.e.*, a hand-wand), a full-height turnstile, a waist-high turnstile, or random screening technology.[6]

Policy-018 also does not mandate that all employees go through screening. It merely provides that security and/or management have the authority to conduct security inspections; it does not require that security inspections occur.

The Security Post Orders are guidelines for contract security. Just as with SEC-306 and Policy-018, the Post Orders do not dictate whether security methods actually occur. It instead provides guidelines <u>if</u> such methods are used.[7]

### B.   <u>There Is No Common Evidence Showing Which Employees Undergo Security Screening</u>

### 1.   There Are Material Differences Between Facilities

There are material differences between FXG's California facilities that impact whether an employee goes through a security screen. Not all of FXG's facilities have a security process.[8] Of those that do, facilities have different screening methods. For example, some locations have random screening technology with up to ten lanes; others do not.[9] Loc. #12 has metal detectors upon ingress and egress. Loc. #17 does not have any metal detectors; rather, employees at that location may be hand-wanded. At Loc. #9, there is no metal detector or hand-wanding. Instead,

---

[6] Random screening technology is used at some FXG locations to reduce the number of individuals that may be screened. The equipment randomly displays either a green or red light. If it is green, the employee does not go through any security and instead walks through without stopping. If it is red, then the employee may be hand-wanded. Local facilities may configure the green:red random ratio based on their own security needs. It also does not track the ratios that local facilities choose to set, or which employees may get a green or red light. ECF 62-5, 63 (SEC-306), p. 5, CE5 Ward Dep. 101:5-102:4, 102:8-21, 103:16-104:1.

[7] CE5 Ward Dep. 18:21-19:2, ECF 62-4, 63 (Post Orders), ECF 62-5, 63 (SEC-306), pp. 1, 3, 5-11, ECF 62-6, 63 (Policy-018).

[8] CE5 Ward Dep. 15:1-20; *see also, e.g.*, CE72 **Baros** ¶3; CE61 **Sears** ¶4; CE56 **Rose** ¶5 ("I have never had to go through any kind of security checkpoint or security while working here at FedEx Ground.").

[9] CE5 Ward Dep. 104:18-105:4; *compare* CE52 **Murillo** ¶8 *with* CE35 **Gonzalez** ¶8.

employees at that location scan a badge to gain access to the worksite.[10]

Some locations may use third-party contractors to provide security services. Contract security may be on site as much as 24 hours per day for 7 days per week, or as little as one day per week. For those locations that use contract security, not all contractors perform the same functions. Other locations do not use contract security, but instead internally manage whatever security needs they may have.[11]

### 2.    There Are Material Differences Within The Same Facility

There are also material differences <u>within</u> the same facility that may impact whether a putative class member undergoes a compensable security screen.

*There may be no security screening on some shifts*. At Loc. #2, for example, contract security is there for the first-half of the workday. Because there is no contract security for the remainder of the day, employees working the second shift walk through an unmanned security screen area and do not engage in any screening.[12]

*There may be no security screening depending on what entrance is used*. Locs. #7, 13, and 21, for instance, have two separate entrances. One entrance has a security process; the other does not.[13]

*There may be no security screening if employees arrive to work one or two minutes late*. At Loc. #20, there is no contract security. Instead, a manager may stand near a metal detector prior to a shift's start, and leaves once it begins. Employees who arrive a few minutes late may walk through an unmanned security area without being screened. Other days, there is no manager standing by the metal detector at Loc. #20; employees could just walk around it if they wanted.[14]

---

[10] Loc. #12: CE75 **Rodriguez** ¶5; Loc. #17: CE50 **Monje** ¶¶5, 8; CE60 **Schmitt** ¶¶5; 8; Loc. #9: CE72 **Baros** ¶3; CE30 **Galvez** ¶5; CE63 **Stevens** ¶5.

[11] CE5 Ward Dep. 15:3-20, 17:12-21; CE75 **Rodriguez** ¶5; CE71 **Arensdorf** ¶3; CE72 **Baros** ¶4; CE73 **Burbank** ¶3; CE40 **Helman** ¶5.

[12] CE71 **Arensdorf** ¶3; CE58 **Ruiz** ¶¶6-7.

[13] CE8 **Amato** ¶¶4-5; CE11 **Arciga** ¶¶4-5; CE37 **Guerrero** ¶¶4-5; CE45 **Lacuzong** ¶¶ 4-5; CE55 **Owens** ¶4; CE1 **Winston** ¶10.

[14] CE17 **Brounner** ¶¶5, 8 ("There is a metal detector here at our facility, but honestly,

*There may be no security screening at different points in the proposed class period.* Loc. #2, for example, began security screening in September 2020. Prior to September 2020, there was an unmonitored metal detector, no bag checks, and no hand-wanding.[15]

*There may be no security screening based on what employees bring to work.*[16]

*There may be no security screening depending on whether employee gets a green or red indicator in response to the random screening technology.*[17]

## C.   There Is No Common Evidence Tracking The Time It May Take To Go Through Security

Plaintiff's Motion erroneously states that FXG "had the ability to track the time employees had to wait in line and pass-through Security Screening." Mot. 13:3-4. Plaintiff does not submit any evidence in support of this contention, other than the unremarkable points that "some facilities have card readers at the security guard stations where employees swipe their ID cards" and "the time that the employees swipe their cards at the readers . . . gets registered." *Id.* at 13:4-8.[18]

The reality is that FXG does not track the amount of time that it may take employees to go through security. While there may be card readers at <u>some</u> facilities and <u>certain</u> locations,[19] card readers are not set up to meaningfully correlate with time

---

it just sits there. Nobody goes through it here"); CE24 **Crackel** ¶¶5, 8 ("You could walk around it if you wanted to"); CE40 **Helman** ¶¶ 5, 8; CE73, **Burbank** ¶3.

[15] CE71 **Arensdorf** ¶ 3.

[16] CE29 **Flores** ¶5 ("If I don't bring anything in, I just walk right through without breaking my stride"); CE36 **G. Gonzalez** ¶5 ("There have been days when I didn't bring a metal water bottle or energy drink with me. On those days, I walk through and it doesn't take any time at all.")

[17] *See, e.g.*, ¶8 of CE 12-13, 21-22, 28, 31, 33, 36, 48, 52 (**Arconado**, **Attardo**, **Chavira**, **Contreras**, **Elliott**, **Gnatyshin**, **G. Gonzalez**, **McNeal**, **Murrillo**, **Garcia**).

[18] Notably, though FXG produced the referenced badge swipe data approximately 7 weeks ago, neither Plaintiff nor his expert submit any analysis of how that data may be utilized as class-wide proof of Plaintiff's claims. Chemers Decl. ¶ 2.

[19] Card readers may be installed at various locations depending on the particular facility's security needs (*e.g.*, computer network rooms, electrical rooms, office rooms, turnstiles, or external fencing, for example). CE2 **Ward** ¶9.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

potentially engaged in security screens.  Nor could they be.  Plaintiff insists that all putative class members had to wait in line before going through security screens, and that on a "good day", he saw up to 40 people in line.  *See, e.g.*, Complaint ¶ 11; ECF 75 (Cuadra Decl.) ¶¶ 7, 10; CE3 Cuadra Dep. 127:1-5.  Card readers could not be installed at the start of all such purported "lines" because those locations would perpetually change.  Employees also do not swipe a card when exiting a secured area.  Card readers are also not installed after metal detectors (if there is one), before or after the particular area(s) that hand-wanding may occur, or before or after the particular area(s) that bag checks may occur.[20]  In sum, there is no common evidence to show the amount of time it may take to go through security upon exit.

### D.  FXG Pays For Potential Security Screening Time

FXG has paid California non-exempt employees for the potential time it may take to go through security screens since September 28, 2019, regardless of whether there are security check practices at the employee's work site.[21]

Because FXG does not track the exact times it may take to go through security, the payments are calculated by multiplying a particular flat amount of minutes by the number of time punches an employee registers each day.  For instance, if an employee punches in to start the day, out for a meal, in from a meal, and back out for the day (*i.e.*, 4 total punches), FXG would pay that employee for 4 times the flat amount.  The flat amounts vary from 1 to 3 minutes per location, have changed throughout the putative class period,[22] and total more than $8 million (Crandall Decl. ¶43).

### E.  FXG's Lawful Meal And Rest Break Policies

FXG's written policies explicitly state that meal breaks must be "at least" 30 minutes and rest breaks must be "at least" 10 minutes in length.[23]  For example:

---

[20] CE2 Ward ¶¶ 7, 10.
[21] CE6 Grabowski Dep. 25:20-23, 28:5-24.
[22] CE6 Grabowski Dep. 26:15-19, 27:20-25, 29:19-25, 47:16-23, 79:2-11.
[23] CE1 Winston ¶¶8, 11-15, CE1A-1E.  Plaintiff's Motion falsely states that "Defendant admits that all policies and guidelines given to class members inform

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

> **States in which a rest break is required:**
> - Although rest break(s) must be at least 10 minutes in length, it is best practice for the breaks to be no more than 15 minutes. Managers can provide longer breaks, but rest breaks of more than 20 minutes are not paid. Unapproved breaks (including breaks that are longer than authorized by a manager) will be addressed through appropriate counseling and disciplinary processes.

FXG's flexible policy to provide at least 30/10 minutes is borne out by putative class members' experiences. Putative class members are not only aware that they <u>can</u> take longer breaks, but often <u>do</u> take longer breaks.[24] Plaintiff's own time records show he took meal breaks up to 41 minutes in length. CE3 Cuadra Dep. 86:2-10.

FXG authorizes employees to leave the premises during their meal and rest periods, but does not track whether employees choose to leave.[25] Putative class members are aware that they can go off-site for their breaks, and often do. Those who choose to take breaks on premises do so for reasons unrelated to security checks.[26]

FXG pays a premium when an employee is not given the opportunity to take a meal or rest break.[27] Local managers may manually enter in a premium payment for any reason—whether it is a short, missed, late, or interrupted break.[28] Plaintiff

_____

them they are entitled to a meal break of only 30 minutes in length." Mot. 9:7-9. In support, Plaintiff string cites 14 pages of testimony from the deposition of FXG's PMK, Shea Winston. None of the cited testimony contains an admission that FXG requires meal breaks to be only 30 minutes. Instead, Ms. Winston repeatedly testified that FXG's policy is to provide meal periods of "at least" 30 minutes in length. CE4 Winston Dep. 54:1-8, 107:1-13, 125:10-22, 136:18-137:14, 171:12-172:2, 179:19-180:6. Moreover, putative class members attest they have never been informed that their breaks must be exactly 30 or 10 minutes. *See, e.g.*, CE36 **Gonzalez** ¶10; CE32 **Givens** ¶¶10-11; CE52 **Murillo** ¶ 10.

[24] *See, e.g.*, CE8 **Amato** ¶6 (60-min. meal breaks); CE50 **Monje** ¶9 (same), CE17 **Brounner** ¶10 (15-min. rest breaks); CE65 **Tobar** ¶10.

[25] CE1 Winston ¶9.

[26] *See, e.g.*, CE12 **Arconado** ¶10 ("I knew that I could leave the facility for 30 minutes. I wasn't prevented from leaving because of the security check process. I just preferred to bring my own food and to sit down and take a rest in the facility."); CE35 **Gonzalez** ¶ 1 ("Personally, for my break, there is no reason for me to leave. The security check has never prevented me from leaving and if I wanted to take 10 minutes outside of the facility, I could."); CE29 **Flores** ¶10; CE50 **Monje** ¶10.

[27] CE1 Winston, CE1C, p. 4; CE1E p. 4.

[28] CE6 Grabowski Dep. 63:3-12, 66:7-16, 89:8-15.

understood his own obligation to report any meal or rest violations; he reported he could not take a rest break in April 2019 and was paid a premium accordingly.[29]

### F.   Plaintiff Ernest Cuadra

Plaintiff Ernest Cuadra worked as a package handler at Loc. #12 until May 15, 2019.  He received his final paycheck that same day.[30]

Though he seeks to represent all California non-exempt employees since March 6, 2019, he did not submit a declaration from any putative class member and he does not know what the security process looks like anywhere other than Loc. #12.[32] Plaintiff instead submitted a declaration with wildly inflated claims about his own experiences, which stand in stark contrast to those of other employees:

| Plaintiff Cuadra | Putative Class Members |
|---|---|
| **Line to Enter the Security Screen** | |
| "There was generally a line where we waited for other employees to pass."<br><br>ECF 75, Cuadra ¶ 7. | "There is no wait to enter the security area." CE41 **Herrera** ¶5.<br><br>"There has never been a line to enter the building through security."  CE54 **Olds** ¶4.<br><br>*See also* ¶5 at CE10, 12, 19-21, 28, 30, 39, 41, 50-51, 63, 67 (**Apodaca**, **Arconado**, **Bushey**, **Chavira**, **Chavez**, **Elliott**, **Galvez**, **Hatfield**, **Herrera**, **Monje**, **Montanez**, **Stevens**, **Vu**) (all attesting there is no line). |
| **Time It Takes to Go Through Security on Entrance** | |
| "From March 2019 to end of employment, I had to wait on average 6-8 minutes to go through this security screening before the start of my workday beginning with waiting in line and going through the security screening itself."<br><br>ECF 75, Cuadra ¶ 8.[31] | "Going through security to enter the building takes no time at all. I just walk right through without stopping or slowing my pace." CE42 **Jacobo** ¶5.<br><br>"Going through security to enter the building takes no time at all, may be a few seconds. I just walk right through without stopping or slowing my pace."  CE46 **Lopez** ¶5. |

---

[29] CE3 Cuadra Dep. 69:17-70:2, 70:15-71:4.

[30] CE3 Cuadra Dep. 34:22-35:6, 153:24-154:20.

[31] Plaintiff testified at deposition that it took him on average 5-6 minutes.  CE3 Cuadra Dep. 128:18-129:9.

[32] CE3 Cuadra Dep. 126:10-14.  Plaintiff repeatedly testified that he sought to

| Plaintiff Cuadra | Putative Class Members |
|---|---|
| **Time It Takes to Go Through Security on Entrance (Cont'd)** | |
| | "The process for entering Loc. #12 is very fast.  I'd say it takes me about six seconds."  CE35 **Gonzalez** ¶ 5 (fellow employee at Loc. #12).<br><br>*See also* ¶5 at CE14-15, 19, 27, 30, 31, 44, 49, 60, 63 (**Aviles**, **Bell**, **Bushey**, **Duplechain**, **Galvez**, **Garcia**, **Kuklinski**, **McWayne**, **Schmitt**, **Stevens**) (all attesting security on entrance takes 0-5 seconds at most). |
| **Exit Process – Shoes, Jacket, Belts** | |
| "I and other employees would empty our pockets. I and other employees would have to . . . take our belts off, then we had to take our shoes off, turn them upside down, and tap them together before placing them on the table next to the items removed and the belt."<br><br>ECF 75, Cuadra ¶¶ 7, 10. | "I do not have to empty my pockets, remove my jacket, or any other article of clothing when leaving for the day." CE 46 **Lopez** ¶8.<br><br>"I have never been required to remove my shoes when I leave."  CE35 **Gonzalez** ¶8 (fellow employee at Loc. #12).<br><br>*See also* ¶8 at CE9, 14, 21, 25, 28, 30, 42, 46 (**Aviles**, **Andrade**, **Chavira**, **De La Cruz**, **Elliott**, **Galvez**, **Jacobo**, **Lopez**) (all attesting no shoe, jacket, belt removal upon exit). |
| **Time It Takes to Go Through Security on Exit** | |
| "From March 2019 to end of my employment, I had to wait on average 8-10 minutes to go through this security screening at the end of my workday beginning with waiting in line and going through the security screening."<br><br>ECF 75, Cuadra ¶ 10. | "Going through security to exit the building takes no time at all.  I just walk right out without stopping." CE28 **Burt-McLaughlin** ¶11.<br><br>"Going through security to exit the building takes no time at all. It is the same as leaving any building." CE42 **Jacobo** ¶8.<br><br>*See also* ¶8 CE14, 20-21, 25, 28, 44, 46, 50, 57, 63 (**Aviles**, **Chavez**, **Chavira**, **De La Cruz**, **Elliott**, **Kuklinski**, **Lopez**, **Monje**, **Rosiles**, **Stevens**) (all attesting security at exit takes a few seconds at most). |

# III.    PLAINTIFF'S CLAIMS ARE NOT CERTIFIABLE

Because class actions are an exception to the usual rule that litigation involves only named parties, "Rule 23 imposes stringent requirements for class certification." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 784

---

represent other non-exempt employees who worked at the <u>City of Industry</u> only, not any other California locations.  CE3 Cuadra Dep. 19:23-20:6; 20:21-24.  He later recanted that testimony through direct examination by his attorney.  *Id.* at 159:10-23.

Case No. 2:20-cv-10719-JFW (SKx)

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

(9th Cir. 2021) (internal quotation marks omitted).  Despite this fact, Plaintiff extrapolates his own experiences to nearly 70,000 non-parties, based solely on conclusory allegations that ignore a shifting kaleidoscope of liability determinations.

### A.   Plaintiff Fails To Establish Either Commonality Or Predominance For The Security Check Claim.

Rule 23(a)(2) requires "questions of law or fact common to the class," with Rule 23(b)(3) further requiring that the questions "common to class members predominate over any questions affecting only individual members."  "[A] district court must find by a preponderance of the evidence that the plaintiff has established predominance under Rule 23(b)(3)."  *Olean*, 993 F.3d at 984.

To establish liability for allegedly unpaid security check time, Plaintiff must proffer common proof that: [1] the proposed class was subject to a screening process and [2] the screening process resulted in compensable time under California law and [3] FXG has not already paid for that time.  Plaintiff has not shown how these issues can be resolved through common proof and without thousands of mini-trials.

### 1.   There Is No Common Proof Of A Mandatory Security Screening Process.

Plaintiff knows he must identify a common unlawful policy, and thus claims that FXG had a uniform screening procedure resulting in searches of "persons and/or belongings every time the employees entered or exited the facilities."  Mot 1:19-20.

The problem is that no such uniform policy exists.  The Security Screening procedure merely identifies various screening methods that "may be" used and with local management determining whether or what kind of process (if any) to employ.[33] Some of FXG's California facilities do not have a security screen process.[34]  Even among those that have had some type of security process in the last 2+ years,

---

[33] CE5 Ward Dep. 18:21-19:2, ECF 62-4, 63 (Post Orders), ECF 62-5, 63 (SEC-306), pp. 1, 3, 5-11, ECF 62-6, 63 (Policy-018).
[34] CE5 Ward Dep. 15:1-20; *see also, e.g.*, CE56 **Rose** ¶5 ("I have never had to go through any kind of security checkpoint or security while working here at FedEx Ground"); CE61 **Sears** ¶4; CE53 **Nealy** ¶5; CE66 **Torres** ¶5.

however, there are critical divergences.  Facilities differ in whether they have: (1) metal detectors that are not monitored; (2) metal detectors that are only monitored during some shifts; (3) multiple entrances, some of which do not have a security process; (4) "randomizers" allowing employees to walk out without stopping; (5) security technology installed now but not earlier in the relevant period; (6) no security process on ingress; and (7) no security process on egress.[35]  This does not even account for various other differences impacting whether an employee engages in compensable security time, including the size of the security area, the number of screening lanes, or whether there is a walk-through metal detector or hand wanding.

In addition to the variation <u>between</u> FXG's 40 facilities, employees also report varying practices <u>within</u> each facility.  This includes situations where some employees can choose to bypass security by using a different entrance; where package handlers are searched more thoroughly than office employees; or where employees do not undergo screens depending on what time of day they work.[36]  And these practices have also varied <u>over time</u>, with locations altering whether they screen employees and whether they use outside guards.[37]

This wide variation in employee experiences is "not a case of lapses in enforcement"; instead, it is consistent with a procedure that does not mandate security screens.  *Ogiamien v. Nordstrom, Inc.*, 2015 WL 773939, at *5 (C.D. Cal. Feb. 24,

---

[35] *See, e.g.*, CE8 **Amato** ¶¶4-5; CE11 **Arciga** ¶¶4-5; CE71 **Arensdorf** ¶3; CE17 **Brounner** ¶¶5, 8; CE24 **Crackel** ¶5 ("I walk right through and even if the metal detector goes off, nobody care"); CE34 **Goforth** ¶5 ("The security booth is not manned. If the metal detector goes off, you just keep going"); CE39 **Hatfield** ¶ 8 ("There is no security on the way out, you just walk out"); CE40 **Helman** ¶¶5, 8 ("I have never had to go through security on the way out, I just leave"); CE52 **Murillo** ¶8; CE53 **Nealy** ¶5; CE58 **Ruiz** ¶¶6-7; CE73 **Burbank** ¶3.

[36] *See, e.g.*, CE50 **Monje** ¶7 ("The security guard sometimes hand-wands me when I exit, but sometimes skips hand-wanding me altogether"); CE1 **Winston** ¶10; CE8 **Amato** ¶¶4-5; CE11 **Arciga** ¶¶4-5; CE73 **Burbank** ¶3; CE37 **Guerrero** ¶¶4-5; CE55 **Owens** ¶4; CE58 **Ruiz** ¶¶6-7; CE71 **Arensdorf** ¶3.

[37] *See, e.g.,* CE71 **Arensdorf** ¶3; CE17 **Brounner** ¶¶5, 8.

2015); *see also Trevino v. Golden State FC LLC*, 2021 WL 2328414, at *14 (E.D. Cal. June 8, 2021) (denying certification where "the absence of screening is an inconsistency in substance, not form").  A policy allowing this degree of flexibility "is just the opposite of a uniform employment practice that would provide the commonality needed for a class action." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011).  Courts routinely deny certification of security check claims under these circumstances. *See, e.g., Trevino*, 2021 WL 2328414 at *12 (denying certification; "[t]he absence of a uniform policy consistently applied throughout the class period precludes resolution of Plaintiffs' claims on a class wide basis and a class cannot be certified based on [enter or] exit screening procedures"); *Hubbs v. Big Lots Stores, Inc*., 2017 WL 2304754, at *9 (C.D. Cal. May 23, 2017) (denying certification; plaintiffs did not present "sufficient evidence to show that there was a common and consistent policy among Defendants to subject all employees at all of their stores to off-the-clock bag checks"); *Quinlan v. Macy's Corp. Servs., Inc*., 2013 WL 11091572, at *4 (C.D. Cal. Aug. 22, 2013) (denying certification; stores "implement[ed] different strategies," altered strategies "depending on the time of day, day of the week, season, [and] level of traffic," and some had no searches at all).[38]

The authorities that Plaintiff cites to in his motion emphasize that a common policy uniformly requiring security checks is needed to certify this claim.  Mot. 16-17, *citing Frlekin v. Apple Inc.*, 309 F.R.D. 518 (N.D. Cal. 2015); *Greer v. Dick's Sporting Goods, Inc.*, 2017 WL 1354568 (E.D. Cal. Apr. 13, 2017).  It was undisputed that the employers in those cases instituted policies uniformly requiring screening of all employees, with any local variation attributable to managers not enforcing a policy. *Id.*  Here, there is no uniform policy requiring security checks for FXG employees.  "Therefore, [Plaintiff's] proposed class inherently involves issues

---

[38] *See also Nevarez v. Costco Wholesale Corp.*, 2019 WL 7421960, at *7-8 (C.D. Cal. Dec. 26, 2019) (denying certification); *Heredia v. Eddie Bauer LLC*, 2020 WL 127489, at *4 (N.D. Cal. Jan. 10, 2020) (same).

of individualized liability because [FXG] cannot be liable to employees that were never subject to the alleged unlawful policy."  *Ogiamien*, 2015 WL 773939 at *5.

### 2. No Common Proof That Potential Security Screens Resulted In Compensable Time.

Plaintiff also fails to present any evidence that potential security processes result in compensable amounts of unpaid time on a class-wide basis.  Citing *Troester*, Plaintiff argues that security checks taking non-existent or negligible amounts of time is immaterial because the *de minimis* doctrine "does not apply to regularly recurring activities such as [the] mandatory searches at issue here."  Mot. 17:16-18.

There are three flaws with this contention.  <u>First</u>, Plaintiff has not actually shown that security screens are "mandatory"[39] and "regularly recurring" given the wide variation in security check practices across FXG's facilities.  While Plaintiff submitted a declaration "detailing [his] own individualized experiences with [security] screening," certification is not justified because he "failed to provide the Court with representative or statistical evidence that all or nearly all putative class members were injured or suffered any delay."  *Trevino*, 2021 WL 2328414 at *15.

<u>Second</u>, even without a *de minimis* rule, "there can be no evidence of injury" for the many employees who do not experience a meaningful security process.  *Id.* There is ample evidence that various facilities did not have a security screen process; or that any screen process added no time to the employees' normal walk into work.[40]

<u>Third</u>, *Troester* actually undermines Plaintiff's argument.  While the California Supreme Court found that the plaintiff was entitled to compensation for spending 4-to-10 <u>minutes</u> on store closing tasks, a concurring justice confirmed that California

---

[39] Plaintiff may argue that employees are required to submit to whatever security process is implemented at their work location.  Even if true, this does not address <u>what</u> security process, if any, existed.

[40] FXG disputes that a security screen, even if it occurred, rises to the required level of "control" so as to trigger compensation, and particularly given the transitory nature of any screen and the impact of personal choice on its length, including what was brought to work.  *See, e.g.*, *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 585–86 (2000); *Rodriguez v. Taco Bell Corp.*, 896 F.3d 952, 957 (9th Cir. 2018).

14

"does not consign employers or their workers to measure every last morsel of employees' time." *Troester v. Starbucks Corp.*, 5 Cal. 5th 829, 849 (2018) (Cuellar, J., concurring).  Thus, even if California law "protects workers from being denied compensation for <u>minutes</u> they regularly spend on work-related tasks", there is no authority to require compensation for activities lasting mere seconds.  *Id.*  In fact, this District subsequently denied certification in *Troester* because other employees "experienced the close store procedure in different ways" than the plaintiff who personally alleged 4-to-10 minutes of unpaid time.  *Troester v. Starbucks Corp.*, 2020 WL 553572, at *8 (C.D. Cal. Jan. 27, 2020).

### 3. Security Check Payments Do Not Solve These Evidentiary Shortcomings And Only Increase The Individualized Issues.

Plaintiff also challenges FXG's business decision to pay for potential security check time through "a flat sum per . . . punch which at times amounts to 12 minutes per day."  Mot. 1:8-10.  FXG's system-generated payments do not establish that security checks actually occurred or took a particular amount of time each day; instead, the payments make it nearly impossible to determine whether putative class members experienced uncompensated time.

Plaintiff fails to demonstrate why it is appropriate to equate the payments with the actual amount of time it may have taken to go through security.[41]  Nor can he do so.  First, FXG does not track actual screening time (if any).  *See supra* II(B)(3).  Second, FXG provides a flat security payment <u>per punch</u> (including for meal punches), irrespective of whether an employee actually engages in a security screen or exits the facility for a meal break.[42]  Third, because Plaintiff's employment ended in May 2019, he never received any security check pay.  He accordingly does not

---

[41] Plaintiff argues that FXG was obligated, as the employer, to record potential security check time.  ECF No. 77, p. 5.  While it is disputed what security check time occurred and whether such time qualifies as hours worked, California law allows businesses to "reasonably estimate worktime" (*Troester*, 5 Cal. 5th at 848), and using flat amounts is sensible when dealing with activities that last mere seconds or less.

[42] CE6 Grabowski Dep. 26:15-19, 27:20-25, 29:19-25, 79:2-11.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

have standing to challenge the payments sufficiency (nor to represent the "post-2019" subclasses 1(b), 4(b), and 5(b)).  *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 357 (1996). Fourth, the evidence confirms that the payments overcompensated potential security screen time.[43]  Numerous putative class members attest that the payments <u>exceed</u> the minimal time (if any) spent going through security.[44]  In short, the security screen pay does not prove that employees actually spend time going through security, and the preponderance of evidence suggests that FXG overpays for any such time with Plaintiff not introducing any evidence to the contrary.  *See also* Crandall Decl. ¶ 16.

FXG's practice to provide security check pay after September 28, 2019 serves only to further complicate certification.  Mot. 13:9-10.  The factfinder cannot determine which employees have unpaid compensation without an examination of: (1) whether the employee underwent security check on any given day; (2) how long the security check may have taken that particular day; and (3) whether the amount of payment that FXG provided that day exceeded the amount of compensation owed for the time it took to go through security.  The problem for Plaintiff's certification motion is that there is no way to assess these critical liability issues on a class-wide basis, because the flat amounts varied by location and time and because there is no common method to measure the amount of compensable time an employee may have

---

[43] Plaintiff asserts in passing that FXG underpaid its employees for security check time since September 28, 2019, but he does not provide any affirmative proof for this allegation.  The Motion instead falsely contends that "FedEx did not pay based on its own estimated times [and] did not increase the paid time for peak seasons."  Mot. 14-15.  The cited evidence is PMK testimony <u>that does not support this hollow proposition</u>.  The PMK instead testified that she was does not know how the amount per punch was determined.  CE6 Grabowski Dep. 92:25-93:9.  Even if Plaintiff was correct about minor imperfections in FXG's security payments, <u>Plaintiff</u> bears the burden of proving that they were insufficient.

[44] CE50 **Monje** ¶8 ("The amount of pay I receive for potential security check time definitely covers the amount of time it actually may take me to go through the process"); *see also, e.g.*, ¶9 at CE16, 19, 21, 23, 28, 31, 33, 43, 57, 67 (**Brizuela**, **Bushey**, **Chavira**, **Corporon**, **Elliott**, **Gnatyshin**, **Kelley**, **Garcia**, **Rosiles**, **Vu**) (all attesting that security pay exceeds amount of time it may take to go through security.)

spent undergoing security on any given day.[45]

*Nevarez v. Costco Wholesale Corp.* illustrates this point.  There, the defendant had a pro-employee rounding policy that effectively provided an additional 3 minutes of pay.  2019 WL 7421960, at *6 (C.D. Cal. Dec. 26, 2019).  Judge Wilson thus denied certification on the security check claim:

> [E]ven if Costco's security procedures always resulted in a delay, and the Court found this compensable time under California law, a rounding policy that permitted employees to end their [shift] 3 minutes early by common practice would frustrate any class-wide finding of liability.  Accordingly, this Court would need to inquire into the precise average length of any delay and comparisons to additional work time credited via pro-employee rounding would be required, submerging the 85,000 member class in a morass of individualized inquiry.

*Id.* at *8.  As in *Nevarez*, FXG's security pay requires detailed inquiries to determine whether there is liability as to a huge group of current and former employees.

For the reasons discussed in the preceding sections, individual issues predominate because: (1) there is no uniform policy requiring security checks or (2) common evidence that security checks result in compensable amounts of time.  Further, since September 28, 2019, (3) there is no common evidence that members of the putative class have not already been paid for any claimed security check time.  Plaintiff's security check claim therefore cannot be certified.

### B.   **Plaintiff's Meal Period Claim Should Not Be Certified.**

Plaintiff's meal period theories that security checks "discouraged or impeded" and "shortened" meal periods are also not suitable for class treatment.

#### 1.   **The Claim Fails Without A Uniform Screening Policy.**

A prerequisite for Plaintiff's meal period claim is the existence of a uniform requirement to undergo compensable security screen time.  Otherwise, there is no way to prove which members of the proposed class had impacted meal periods.  Because Plaintiff has failed to show the primary security time claim is appropriate for certification, his secondary claim also fails.

---

[45] CE6 Grabowski Dep. 26:15-19, 27:20-25, 28:5-24, 47:16-23, 51:3-12, 79:2-11.

47939461_3.docx

## 2. There Is No Common Evidence That Meal Periods Were Exactly 30 Minutes.

Plaintiff's meal period theory is also dependent on Plaintiff showing that FXG provides exactly 30 minutes for meal periods, since such a policy—combined with the alleged security checks—might result in meals that are short or that cannot be taken outside of FXG's worksites. Plaintiff recognizes this reality and strains to argue that FXG provides "a meal break of <u>only</u> 30 minutes in length." Mot. 9:7-8.

Once again, Plaintiff mischaracterizes the record evidence. While some documents refer to meal periods lasting 30 minutes, other FXG procedures state that a meal period should be "at least" that long[46] and FXG's PMK repeatedly testified that was FXG's policy.[47] Other evidence suggests that longer meal periods are permitted, including Plaintiff's time records and numerous putative class member declarations.[48] It is further borne out by punch data for the putative class, with Plaintiff's own expert admitting that 84% of meals were <u>at least</u> 31 minutes. CE7 Roberts Dep. 182:3-13. Dr. Roberts further agreed there was considerable "variability" and that he "would probably expect" a greater percentage of 30-minute meals <u>if</u> FXG rigidly controlled meal period length, as Plaintiff contends. *Id*. at 179:22-180:4; 183:12-18.

Consequently, even if Plaintiff could prove that employees experience uniform security checks (he has not), that does not create uniform liability since a factfinder must still individually determine whether each employee could take a full 30 minutes at a location of their liking and notwithstanding the alleged security check time.

## 3. There Is No Common Evidence That Meal Periods Lasting 30 Or Fewer Minutes Were Shortened By Security Checks.

In an effort to circumvent his evidentiary failings, Plaintiff suggests that he

---

[46] CE1 Winston ¶¶ 8, 11-15, CE1A-1E.
[47] CE4 Winston Dep. 54:1-8, 107:1-13, 125:10-22, 136:18-137:14, 171:12-172:2.
[48] *See, e.g*., CE3 Cuadra Dep. 86:2-10; CE50 **Monje** ¶ 9 ("I pretty consistently take a 60-minute meal break every day"); CE8 **Amato** ¶6 (60-min. meal periods); CE33 **Gnatyshin** ¶10 (45-min. meal periods); CE65 **Tobar** ¶ 9 (45-min. meal periods); CE36 **Gonzalez** ¶ 10; CE43 **Kelly** ¶10; CE22 **Contreras** ¶9; CE46 **M. Lopez** ¶10; CE54 **Olds** ¶ 6.

might prove liability by focusing on shifts where employees' "meal break punch reflects a 31 minute or less meal break and they had to go through the mandatory security process during their meal break." Mot. 19:27-20:1. Once again, this incorrectly presumes that a trier of fact can readily determine whether each employee was subject to a "mandatory security process" and the time involved.

Even if that was possible, Plaintiff's claim for "shortened" meals still fails. An employer satisfies its meal period obligations if it provides employees with the opportunity to take an uninterrupted 30-minute meal period; an employee declining the break does not create liability for the employer. *Brinker Rest. Corp. v. Sup. Ct.*, 53 Cal. 4th 1004, 1040-41 (2012). Plaintiff's proffered "common evidence" to support his theory is time records; they do nothing to prove his claim. There are numerous reasons—none of which would be reflected in the data—why an employee might record a meal lasting 31 minutes or less. For instance, employees might take a shorter meal due to personal convenience, a desire to finish working sooner, or just because they finished eating. Yet, Plaintiff would impose liability based solely on these personal choices, an outcome that even his favored authorities do not support.

For example, in the *Hamilton* case, the judge <u>decertified</u> a shortened meal theory where there was "no single uniform written policy" requiring 30-minute meals, "no consistent practice of denying uninterrupted thirty-minute meal breaks," and where, even if such evidence existed, "how those policies affect members of the class depends on the individual circumstances of each employee." *Hamilton v. Wal-Mart Stores, Inc.*, 2019 WL 1949457, at *15, n.16 (C.D. Cal. Mar. 4, 2019).

### 4. There Is No Common Evidence That Employees Were Discouraged Or Impeded From Leaving The Premises.

The "controlled" theory is equally unsupported by any common evidence. FXG employees can and do leave the premises for meal periods,[49] and can take the

---

[49] *See, e.g.*, ¶¶ 9-10 of CE20, 35, 51, 59, 63, 66 (**Gonzalez** ["If I'm going to leave [the premises], I may take a full 30 minutes outside"], **Montanez** ("I almost never stay on premises"), **Shaub** ("If I wanted to leave the [premises] and spend 30 minutes eating food in my car, I could"), **Chavez**, **Stevens**, **Torres**.

entire 30 minutes outside.  Other employees report that they instead prefer to eat inside and that the security process, if any, has no impact on their decision.[50]  Plaintiff concedes as much, including that he left the premises approximately 60% of his shifts that were meal period-eligible.  Thus, delving into the subjective reasons concerning why an employee did or did not leave the work location each day implicates the same individualized determinations that doom Plaintiff's other claims.

Plaintiff argues that the *Hamilton* case requires the Court to counter-intuitively find that this is an objective question capable of resolution.  *Hamilton v. Wal-Mart Stores, Inc.*, 2018 WL 4813082 (C.D. Cal. Aug. 21, 2018).  *Hamilton*, however, involved workers at a <u>single</u> Wal-Mart fulfillment center, with no apparent dispute that all associates had to "pass through a security process when exiting the facility." *Id.* at *1, *4.  That is the very type of uniform policy which Plaintiff has failed to establish here due to significant variations among the 67,000+ putative class members working in over 40 FXG facilities over the last 2+ years.  This case does not resemble *Hamilton* but instead is comparable to the *Trevino* matter, where the judge refused to certify a meal period claim because the security checks varied by facility and over time.  2021 WL 2328414 at *16-17.

Finally, Plaintiff's class definition encompasses the time period after September 28, 2019, when FXG paid for potential security check time.  As such, Plaintiff requests that the Court certify a class of persons who were purportedly "discouraged or impeded" from taking meal periods despite evidence that this group took meal periods off premises and received pay for possible security check time.

---

[50] *See, e.g.*, CE8 **Amato** ¶6; CE12 **Arconado** ¶10 ("I wasn't prevented from leaving because of the security check process. I just preferred to bring my own food and to sit down and take a rest in the facility"); CE36 **Gonzalez** ¶11 ("Personally, for my break, there is no reason for me to leave.  The security check has never prevented me from leaving and if I wanted to take 10 minutes outside of the facility, I could."); CE42 **Jacobo** ¶8; CE43 **Kelly** ¶10; CE50 **Monje** ¶10; CE55 **Owens** ¶6; CE60 **Schmitt** ¶ 10 ("Getting hand-wanded and walking by security has not discouraged me from leaving the premises during breaks. It doesn't impact my decision"); CE59 **Shaub** ¶11.

### C.     Plaintiff's Rest Period Claim Should Not Be Certified.

Plaintiff's rest period claim falters for the same reason as his meal period claim, though there are additional reasons for finding individual issues predominate.

<u>First</u>, Plaintiff fails to show any common policy that all employees must go through a security check or that those potential checks impaired rest break time.

<u>Second</u>, Plaintiff also fails to show that rest breaks have to be exactly 10 minutes, even though such a rule is necessary to establish liability under Plaintiff's theory.  As with meal periods, FXG's policies do not state that breaks must be "only" 10 minutes long.  Instead, policy documents confirm that breaks must be "at least" 10 minutes and up to 15 minutes or longer with a manager's permission.[51]  Likewise, depositions and declarations confirm that FXG employees can and do take more than 10 minutes for rest breaks.[52]  Thus, even if employees wanted to leave the premises during a rest break, they could choose to take a full 10 minutes off premises.

<u>Third</u>, there is no way for Plaintiff to identify the supposedly "shortened" breaks.  While FXG disputes that time records can establish violations for meal periods, rest breaks are not recorded and hence days where someone took exactly 10 minutes or less cannot be identified.

<u>Fourth</u>, identifying a "short" break is only one-half of the liability puzzle; it would also be necessary to determine <u>why</u> an employee took a "short" break, whether it was due to personal choice or otherwise.  Thus, "even if [employees] were subject to brief delays while leaving the facility for breaks, individualized questions about which employees did not in fact receive a full rest break or were genuinely limited in what they could do for their breaks, predominate over any common questions." *Trevino*, 2021 WL 2328414 at *18.

<u>Fifth</u>, there is no common evidence that employees were "discouraged or

---

[51] CE1 Winston ¶¶8, 11-15, CE1A-1E.

[52] *See, e.g.*, ¶11 at CE16, 21, 46, 51, 60 (**Brizuela**, **Chavira**, **Lopez**, **Montanez**, **Schmitt**) and ¶10 at CE17, 25 (**Brounner**, **De La Cruz**, **Galvez**).

impeded" from taking rest breaks.  This theory suffers from the same frailties as the meal period claim, including subjective reasons that impact liability determinations about why someone might not choose to leave the premises for a rest break.  It also ignores the reality that rest breaks are much shorter than meal periods, with Plaintiff's legal authority recognizing that a 10-minute break "impose[s] practical limitations on an employee's movement" such that "employees will ordinarily have to remain on site or nearby."  *Augustus v. ABM Security Servs., Inc.*, 2 Cal. 5th 257, 270 (2016).  The Court should therefore decline Plaintiff's invitation to certify an overbroad class of any person who worked a rest-period eligible shift.

### D.      Plaintiff's Wage Statement Claim Should Not Be Certified.

Plaintiff's wage statement claim is based on the theory that wage statements failed to include the supposedly uncompensated time that employees underwent security screens.  Plaintiff will therefore need to provide common evidence to establish that employees actually underwent compensable screens.  Unless Plaintiff can certify his primary claim based on security checks (and he cannot), the Court should deny certification for these derivative classes as well.  *See Nevarez*, 2019 WL 7421960 at *9 (denying certification; derivative pay stub claim based on bag checks).

### E.      Plaintiff's Final Wages Claim Should Not Be Certified.

The same issues apply to Plaintiff's claim for waiting time penalties.  Plaintiff has not provided common evidence establishing which employees were undercompensated for potential security screens at the end of employment.  If Plaintiff's primary claim for security check pay is not certified, then this derivative claim fails alongside it.  Further, additional inquiries are required for persons who received security pay since September 28, 2019, since the factfinder must compare those payments (totaling more than $8 million) against the time allegedly spent on security checks to determine whether any further wages are owed to each employee.[53]

---

[53] This also implicates fact-intensive offset arguments for the period prior to September 28, 2019.  As discussed elsewhere, many employees confirm that they

### F.      There Is No Evidence To Determine Who Was Injured.

Plaintiff further fails to establish predominance because his proposed class definitions include uninjured persons and there is no common evidence to identify which putative class members are not injured.[54]  In *Olean*, the Ninth Circuit made clear that "[i]f injury cannot be proved or disproved through common evidence, then individual trials are necessary to establish whether a particular [class member] suffered harm from the [alleged misconduct], and class treatment under Rule 23 is accordingly inappropriate."  Accordingly, a court "must" determine whether a plaintiff's proffered evidence sweeps in uninjured class members.  *Id.* at 791.  A proposed security check class is therefore inappropriate where plaintiffs fail "to establish[] predominantly that all or nearly all members of the proposed class suffered injury" by undergoing security screens.  *Trevino*, 2021 WL 2328414 at *15.

Here, Plaintiff ties membership in each class to the employee working "at any facility that had a Security Screening process" across a period of months or years.  Mot. 2-3.  A fatal problem with Plaintiff's proposed class definitions is that they unquestionably include uninjured employees.  The evidence confirms there are putative class members who—despite working at a facility that may have some screening methods—do not undergo any uncompensated screen time.  This includes, but is not limited to, non-exempt employees who work at locations with security but who have the option of going through a separate entrance with no screening process,[55] or that only have security at certain times of day.[56]  Such persons fall within the class definitions whether or not they actually undergo screens.  *Supra* Section II.B.2.

---

were overpaid for security checks during the period since September 28, 2019, and these overpayments must then be weighed—on a person-by-person basis—against the amounts allegedly owed during the earlier period.  *See supra* FN44.

[54] *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) (Roberts, C.J., concurring) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.").

[55] *See, e.g.*, CE1 Winston ¶10; ¶¶4-5 at CE8, 11, 37 (**Amato**, **Arciga**, **Guerrero**).

[56] CE58 **Ruiz** ¶¶6-7; CE71 **Arensdorf** ¶3.

Plaintiff has not offered any common evidence to determine which putative class members may have suffered injury.  At most, there is evidence about which employees received flat security check payments; but, for the reasons discussed above, that does not mean the employee experienced uncompensated security time.

Plaintiff presents the Court with two options that underscore how certification is inappropriate.  The Court can accept Plaintiff's proposed class definitions and sweep in people who were not harmed by the supposedly unlawful policies.  Or, the Court can attempt to narrow the proposed classes to persons who actually experienced a meaningful security check process, with Plaintiff presenting no way to determine who falls within that group without its own cluster of individualized inquiries.

### G.   <u>Plaintiff Offers No Method To Manageably Try This Case.</u>[57]

Plaintiff must establish a "suitable and realistic trial plan of the class claims," a requirement that cannot be deferred past the certification stage.  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001).[58]  Despite his own recognition that a trial plan is "<u>critical</u> to the court's [] inquiry", Plaintiff presents an anemic trial plan that fails to demonstrate how the claims of some 670,000 putative class members could ever be effectively managed in a collective trial.  ECF 77, p. 3.

Plaintiff first proposes that liability can be established through policy documents, even though there is no policy that requires all putative class members to undergo uncompensated and compensable security screens.  Plaintiff next states that liability may be established through "witness testimony" (*id.* at p. 10), though he provides no explanation for how non-existent testimony will prove liability for tens of thousands of people—especially given the contrary and varying evidence FXG has presented.

Plaintiff finally suggests that liability may be established by his expert, including a proposed survey of putative class members.  *Id.*  Dr. Roberts' testimony is not entitled

---

[57] FXG refers the Court to its simultaneously-filed Response to Trial Plan.
[58] *See also Coates v. United Parcel Serv.*, 2019 WL 8884492, at *7 (C.D. Cal. July 2, 2019) (denying certification in security check case because plaintiff's expert "neither formulated nor administered a survey, analyzed the results, or prepared a report").

to any weight, as detailed in the Crandall Declaration and FXG's objections.[59]  Rather than develop work product based on "the facts of this case" as mandated by FRE 702, Dr. Roberts recycled his survey from a case involving different facts against UPS.  He failed to adequately test the survey with FXG employees, did not modify the format to address FXG-specific issues like security pay, and did not even remove an internal reference to "UPS".[60]  Once he has flawed results from as little as 1% or less of the proposed class, Dr. Roberts plans to extrapolate them to the remaining 99% through a "bootstrapping" process.  ECF 76, p. 11 (¶ 35).  This is exactly the type of "Trial by Formula" rejected by the Supreme Court in *Dukes*, 564 U.S. at 367, and other decisions because it "fail[s] to measure damages resulting from the particular . . . injury on which [FXG's] liability is premised."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

The trial plan violates FXG's due process rights and ensures it has "different rights in a class proceeding than [it] could have asserted in an individual action." *Dukes*, 564 U.S. at 367; *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1048 (2016).

## IV.   CONCLUSION

FXG respectfully submits that the Motion should be denied in its entirety.

DATED: July 26, 2021             OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.


By:  /s/ Alexander M. Chemers
        Evan R. Moses
        Alexander M. Chemers
        Melis Atalay
        Attorneys for Defendant
        FEDEX GROUND PACKAGE SYSTEM, INC.

---

[59] Expert evidence at class certification is subject to the same "rigorous analysis" that applies to other evidence, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).  "[I]n evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*."  *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018).
[60] Crandall Decl. ¶¶ 70, 73; ECF 76, p. Appendix C, p. 39 (response to question 10 includes "I did not work at other **UPS** warehouse locations").