EVAN R. MOSES, CA Bar No. 198099
evan.moses@ogletree.com
ALEXANDER M. CHEMERS, CA Bar No. 263726
alexander.chemers@ogletree.com
MELIS ATALAY, CA Bar No. 301373
melis.atalay@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA 90071
Telephone: 213-239-9800
Facsimile: 213-239-9045

Attorneys for Defendant
FEDEX GROUND PACKAGE SYSTEM, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNEST CUADRA, on behalf of himself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FEDEX GROUND PACKAGE SYSTEM, INC., a Delaware corporation; FEDEX, a business entity unknown; and DOES 1 to 100, Inclusive,<br><br>Defendants. | Case No. 2:20-cv-10719-JFW (SKx)<br><br>**DEFENDANT'S RESPONSE AND OBJECTIONS TO DECLARATION OF WILLIAM W. ROBERTS, PH.D. IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>[Filed concurrently with Opposition to Motion for Class Certification; Compendium of Evidence; Declarations of Alexander M. Chemers and Robert Crandall, MBA]<br><br>Date: August 16, 2021<br>Time: 1:30 p.m.<br>Place: Courtroom 7A<br><br>Complaint Filed: December 3, 2019<br>Trial Date: December 14, 2021<br>District Judge: Hon. John F. Walter<br>　　　　　　　　Courtroom 7A, First St.<br>Magistrate Judge: Hon. Steve Kim<br>　　　　　　　　Courtroom 540, Roybal |

Case No. 2:20-cv-10719-JFW (SKx)
DEFENDANT'S RESPONSE AND OBJECTIONS TO DECLARATION OF
WILLIAM W. ROBERTS, PH.D. IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

47879869_5.docx

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ............................................................... 1

II. THE ROBERTS REPORT RELIES UPON EVIDENCE FROM A DIFFERENT CASE INVOLVING DIFFERENT PARTIES AND FACTS ............................................................................................... 2

    A. The Roberts Report Is Dependent Upon Dr. Roberts' Prior Work Involving Litigation Against UPS ........................................ 2

        1. Because He Believes That The Two Cases Are "Very Similar," Dr. Roberts Relied On The Facts Of The *Sims* Case In This One. ............................................. 3

        2. Dr. Roberts Admits That He Knows Little About FXG's Security Practices. ..................................................... 4

        3. The Roberts Report Proposes Using a Recycled Questionnaire Prepared For Litigation Against UPS That Includes References To The Wrong Employer. .......... 5

        4. Dr. Roberts Relied Only Upon Cognitive Interviews Of UPS Employees And Litigants With Active Cases Against FXG. ............................................................ 6

        5. The Roberts Report Is Nothing More Than A Watered-Down, Last-Minute Reproduction Of The *Sims* Report. ........................................................................ 7

    B. The Record Indicates That Security Practices At FXG and UPS Are Not "Very Similar," Thus Undermining Dr. Roberts' Opinions. ........................................................................ 8

        1. FXG Has Paid For Potential Security Check Time For Most Of The Proposed Class Period. ........................... 8

        2. Dr. Roberts Does Not Account For The Lack Of Uniformity In FXG's Security Check Policy And Practices. ................................................................................ 10

III. CONCLUSION ......................................................................................... 11

IV. SPECIFIC EVIDENTIARY OBJECTIONS ......................................... 11

47879869_5.docx

i  Case No. 2:20-cv-10719-JFW (SKx)
DEFENDANT'S RESPONSE AND OBJECTIONS TO DECLARATION OF
WILLIAM W. ROBERTS, PH.D. IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abarca v. Merck & Co., Inc.*,
 2010 WL 4643642 (E.D. Cal. Nov. 9, 2010) ....................................................... 5

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993) ............................................................................................ 2

*Elsayed Mukhtar v. California State Univ., Hayward*,
 299 F.3d 1053 (9th Cir. 2002) ............................................................................ 2

*Gibson v. City of Riverside*,
 181 F. Supp. 2d 1057 (C.D. Cal. Jan. 4, 2002) .................................................. 9

*Jimenez v. Allstate Ins. Co.*,
 765 F.3d 1161 (9th Cir. 2014) ............................................................................ 9

*Kumho Tire Co. v. Carmichael*,
 526 U.S. 137 (1999) ............................................................................................ 2

*Sirko v. Int'l Business Machines Corp.*,
 2014 WL 4452699 (C.D. Cal. Sept. 3, 2014) ..................................................... 9

*Thomas Sims II v United Parcel Service, Inc.*,
 Case No. 2:20-cv-00378PSG-AFM (C.D. Cal. 2020) ............................... 2, 8, 9

**Other Authorities**

Fed. R. Evid. 602 ............................................................................................... 11, 12

Fed. R. Evid. 702 ...................................................................................................... 2

Fed. R. Evid. 704 .................................................................................................... 12

47879869_5.docx

ii   Case No. 2:20-cv-10719-JFW (SKx)
DEFENDANT'S RESPONSE AND OBJECTIONS TO DECLARATION OF
WILLIAM W. ROBERTS, PH.D. IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Defendant FedEx Ground Package System, Inc. ("FXG") hereby responds and objects to the expert report submitted by plaintiff Ernest Cuadra's retained expert, William W. Roberts, Ph.D. ("Dr. Roberts" and the "Roberts Report") (ECF No. 76). FXG also submits further specific evidentiary objections below.

## I.  PRELIMINARY STATEMENT

In deciding this Motion for Class Certification, the Court should ignore the incomplete and unfounded musings of the Roberts Report.

Dr. Roberts proposes using a questionnaire that he originally created for litigation against a different company—the United Parcel Service ("UPS")—and which he has not yet administered.  Dr. Roberts concedes that he is not familiar with FXG's security check practices, including variation by location, employee group, or moment in time, and yet he asserts without foundation that it is "very similar" to the practices of UPS.  As a result, Dr. Roberts believes that he can re-use his previous work product in this case to supply the common evidence that Plaintiff has otherwise failed to provide and despite his burden as the party seeking class certification.

Dr. Roberts' opinions and testimony are inadmissible and unworthy of any credence.  Because of his unsupported belief that the security practices at FXG and UPS are "very similar," Dr. Roberts did not attempt to customize his questionnaire to "the facts of the case" as required by Rule 702 of the Federal Rules of Evidence.  Dr. Roberts testifies that FXG, unlike UPS, has collectively paid millions of dollars to putative class members for potential security check time.  Yet, the recycled questionnaire from the UPS litigation fails to mention this fact.  Likewise, the record evidence in this matter confirms that whether and what kind of security practices exist vary widely between FXG's California locations.  Once again, Dr. Roberts blindly repeats the format of his previous questionnaire, and without even bothering to ask respondents whether they were subject to a security check or what it entailed.  Because it is not tailored to "the facts of the case," Dr. Roberts' proposed questionnaire is poorly designed and will not elicit relevant information.

These fundamental errors and others in survey design, as detailed here and in the accompanying Declaration of Robert Crandall, MBA, undermine the very purpose of the questionnaire and underscore that it cannot be relied upon to support class certification.

## II. THE ROBERTS REPORT RELIES UPON EVIDENCE FROM A DIFFERENT CASE INVOLVING DIFFERENT PARTIES AND FACTS

Rule 702 of the Federal Rules of Evidence ("FRE 702") governs the admissibility of expert testimony. A court has "broad latitude" to decide whether to consider such evidence. *Elsayed Mukhtar v. California State Univ., Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002), *overruled on other grounds in Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014). To be admissible though, the evidence must be "reliable and relevant." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590-591 (1993). To be relevant, the Court must decide whether the expert's testimony fits the facts of the case and will assist the trier of fact. *Id*. at 591-592. The Roberts Report does not.

### A. The Roberts Report Is Dependent Upon Dr. Roberts' Prior Work Involving Litigation Against UPS

It is axiomatic that an expert's opinions should be tied to the specific case at issue. This rule is enshrined in Rule 702 of the Federal Rules of Evidence, which obligates any supposed expert to offer opinions only if "the expert has reliably applied the principles and methods **to the facts of the case**." (Emphasis added.) Yet, the Roberts Report does not fit the facts of this case, but is instead impermissibly premised upon facts in a different matter—*Thomas Sims II v United Parcel Service, Inc.*, Case No. 2:20-cv-00378PSG-AFM (C.D. Cal. 2020) ("*Sims*").

First, Dr. Roberts testified at deposition that he created the proposed questionnaire at issue by recycling the questionnaire he prepared months earlier in *Sims*. A comparison of the cover letters and proposed questionnaires demonstrate

their similarities down to the very wording of the instructions and some questions, including a continuing reference to "UPS warehouse locations."

<u>Second</u>, Dr. Roberts testified that he did not test the survey by conducting cognitive interviews of non-biased FXG employees. Rather, Dr. Roberts only questioned Plaintiff Cuadra and another litigant, Marisa Graef, because he previously tested his survey with <u>UPS</u> employees. Though Plaintiff possessed the contact information for more than 6,500 class members, and though Dr. Roberts testified it is "best practice" to test a survey's design by asking the questions to those individuals with knowledge of the facts at issue, Dr. Roberts skipped this simple albeit critical step in survey design.

<u>Third</u>, the Roberts Report quotes from the *Sims* case *verbatim*, which demonstrates that Dr. Roberts is simply relying upon this prior litigation instead of applying his proposed questionnaire methodology to the facts of this case.

<u>Fourth</u>, Dr. Roberts' proposed cover letter and questionnaire fail to account for many of the key facts *in this case*, and thus it is guaranteed to generate results that will not assist the Court or the trier of fact in resolving Plaintiff's claims. More pressingly, Dr. Roberts' proposed cover letter and questionnaire—together with his unproven theories for how the results may assist Plaintiff—are meaningless to whether Plaintiff's claims should be certified.

### 1. Because He Believes That The Two Cases Are "Very Similar," Dr. Roberts Relied On The Facts Of The *Sims* Case In This One.

Throughout his deposition, Dr. Roberts made clear that the previous *Sims* litigation shaped his opinions in this litigation, including the claims that are at issue, the underlying facts at FXG, and what his proposed questionnaire is likely to show.

When he was asked the most basic question—"And what's your understanding for what this case, *Cuadra v. FedEx Ground*, is about?"—the very first words out of Dr. Roberts' mouth were—"It's very similar to the UPS case." CE7, Roberts Dep. 24:7-9. Later on, he confirmed again his belief that the process for entering or

47879869_5.docx

3   Case No. 2:20-cv-10719-JFW (SKx)
DEFENDANT'S RESPONSE AND OBJECTIONS TO DECLARATION OF
WILLIAM W. ROBERTS, PH.D. IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

leaving a FXG facility was "[v]ery similar" to the process at UPS. *Id.* at 148:3-19. His experience with litigation involving UPS even tainted Dr. Roberts' belief for what his questionnaire is likely to show: "From the individuals I talked to **in UPS**, and two individuals I talked to here, my gut reaction is that it's probably more than one or two minutes a day going through the security – for the security wait time." *Id.* at 219:15-220:2 (emphasis added).

Dr. Roberts repeatedly referenced the *Sims* litigation in his deposition responses, time and again showing that his opinions in this matter are dependent upon his work in previous litigation involving a different defendant and different facts.

### 2. Dr. Roberts Admits That He Knows Little About FXG's Security Practices.

Despite his assumption that the security check practices at FXG are "very similar" to those at UPS, Dr. Roberts conceded at his deposition that he has no working knowledge of FXG's security check practices.

Dr. Roberts admits that he has never observed FXG's security check practices—either on ingress or egress. CE7, Roberts Dep. 146:25-148:2. Not surprisingly, he was obligated to respond "I don't know" dozens of times when asked questions about FXG's security practices. *See, e.g.*, *id.* at 77:19-81:6 (Dr. Roberts admitting he has no knowledge about how security practices might vary between subsets of employees, locations, and over time); 83:3-84:11 (Dr. Roberts admits he has no knowledge about whether and how hand-wanding varied between subsets of employees, locations, and over time); 152:17-153:13 (Dr. Roberts admits he does not know about FXG's use of walk-through metal detectors).

In sum, Dr. Roberts does not know <u>who</u> is subject to security checks at FXG, whether those security checks vary <u>by location</u>, whether those security checks vary <u>by groups of employees</u>, whether those security checks vary <u>over time</u>, or what those security checks <u>might involve</u>, among other facts. He thus has no grounds, and

1  particularly not a scientifically and empirically-derived basis, to conclude that FXG's
2  security practices are "very similar" to whatever practices existed in *Sims*. Such
3  conjecture cannot be admitted. *Abarca v. Merck & Co., Inc.*, 2010 WL 4643642,
4  at*4 (E.D. Cal. Nov. 9, 2010) ("It is an abuse of discretion to admit expert testimony
5  which is based on assumptions lacking any factual foundation in the record.").

### 3. The Roberts Report Proposes Using a Recycled Questionnaire Prepared For Litigation Against UPS That Includes References To The Wrong Employer.

8  Despite not actually knowing anything about security check practices at FXG,
9  Dr. Roberts proposes using a recycled questionnaire from the *Sims* litigation. For
10 example, Dr. Roberts testified that he created the proposed questionnaire in the
11 current matter by starting with the questionnaire he prepared in *Sims*. CE7, Roberts
12 Dep. 46:3-14. A comparison of the two questionnaires, however, suggests that it was
13 more than a starting point.

14 First, the *Sims* and *Cuadra* cover letters are carbon copies of each other. The
15 language in the introductory paragraphs and instructions mirror one another with the
16 only changes made being to the date of the letter and the case names, case numbers,
17 and the class period. *Compare* ECF No. 76 p. 37 *with Sims* ECF No. 57-7 p. 65.

18 Turning to the first page of each questionnaire, the introductory paragraphs
19 again mimic one another in all but one way: Dr. Roberts struck the previously
20 offered example of "20 to 40 seconds" from the *Sims* questionnaire for reasons he
21 cannot explain. *Compare* ECF No. 76 p. 38 *with Sims* ECF No. 57-7 p. 66; CE7,
22 Roberts Dep. 66:19-67:2. Of the 16 questions offered in the *Sims* case, 14 are
23 reproduced, in full or in part, with only slight modifications generally designed to
24 avoid issues relating to "walking time," a claim that Plaintiff does not assert in this
25 action. So similar are the questions and their responses, in fact, that in question 10,
26 Dr. Roberts forgot to change the fourth offered response: "I did not work at other
27 UPS warehouse locations." ECF No. 76 p. 39.

28 Ultimately, the only changes that Dr. Roberts appears to have made to his

5  Case No. 2:20-cv-10719-JFW (SKx)

47879869_5.docx

DEFENDANT'S RESPONSE AND OBJECTIONS TO DECLARATION OF
WILLIAM W. ROBERTS, PH.D. IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1  questionnaire serve to ensure that the results would be one-sided and in Plaintiff's
2  favor.  As noted above, Dr. Roberts removed the reference in the *Sims* questionnaire
3  to a security check taking "20 to 40" seconds so that it exclusively referenced the
4  alleged checks potentially taking "3 to 5 minutes," which even Dr. Roberts admits
5  could "seed" a higher number in the mind of respondents and thus result in larger
6  estimates.  CE 7, Roberts Dep. 65:21-66:18 (testifying that seeding "gives them an
7  idea that they can give a range"); 163:6-19.  Likewise, the *Sims* questionnaire
8  specifically asked respondents how often they may have left work for an offsite meal
9  period despite supposedly being discouraged or impeded from doing so.  CE7,
10 Roberts Dep. 163:21-164:23.  In the *Sims* case, this question resulted in responses
11 that were not favorable to Plaintiff's theories of liability, with the relatively small
12 number of respondents (68) confirming that they regularly did leave the premises for
13 meals despite UPS' security processes.  *Id.*; *see also Sims* ECF No. 57-7 p. 34 (¶ 81
14 (respondents left the UPS worksite an average of 1.39 times every two weeks).
15    The Court can reach its own conclusions as to why Dr. Roberts—despite
16 largely mirroring the *Sims* questionnaire—excluded from this case a numeric
17 example ("20 to 40 seconds") and a question that are likely to generate responses
18 which are harmful to Plaintiff's theories of liability.

### 4. Dr. Roberts Relied Only Upon Cognitive Interviews Of UPS Employees And Litigants With Active Cases Against FXG.

21    Dr. Roberts testified about the importance of "testing" a questionnaire with
22 potential respondents as part of the questionnaire design process.  CE7, Roberts Dep.
23 40:1-9.  He testified that he conducts "cognitive interviews" to see if the questions he
24 prepared are "understandable," to see if "they work."  *Id*.  He even emphasized that
25 such cognitive interviews are "best practices" in the industry which should be
26 conducted on "individuals who are knowledgeable about the conditions that you're
27 asking about."  *Id*. at 42:13-23.
28    Despite Plaintiff possessing the contact information for more than 6,500 class

1  members, Dr. Roberts did not attempt to interview even one of them.  CE7, Roberts
2  Dep. 48:11-15.  Instead, Dr. Roberts exclusively talked to two plaintiffs who are
3  involved in active litigation against FXG—the Plaintiff in this matter (Ernest
4  Cuadra) and Marisa Graef, who also has a wage-and-hour case pending against FXG.
5  *See* C.D. Cal. Case No. 2:20-cv-7456-JFW(SKx).  Dr. Roberts reasoned that this
6  expedited testing procedure was sufficient because he previously tested the questions
7  on UPS employees, stating: "I believe I talked with enough individuals that had gone
8  through this type of a security process that further modifications to the questions are
9  extremely unlikely."  CE7, Roberts Dep. 43:17-44:8; 48:11-49:4; *see also* 160:5-
10 161:19 ("I did not find the cognitive interviews in this case added to the information
11 that I had from – obtained from prior cognitive interviews in the UPS case.").
12 Finally, Dr. Roberts admits that he never tested the final version of his questionnaire
13 for this case with anyone.  *Id*. at 48:11-49:16.

14       This disregard for what Dr. Roberts himself described as "best practice" in the
15 industry goes to the very design of the questionnaire and cannot be ignored.  UPS
16 and FXG are different companies, with different employees and different security
17 check practices—facts that Dr. Roberts would have learned had he made a good-faith
18 endeavor to interview potential FXG class members and instead of coasting along
19 based on his previous work product formulated for a prior—and unrelated—
20 litigation.

21
      **5.    The Roberts Report Is Nothing More Than A Watered-Down, Last-Minute Reproduction Of The *Sims* Report.**
22

23       The Roberts Report is strikingly similar to the testimony he offered in support
24 of Plaintiff's Motion for Class Certification in *Sims*.  For example, in both cases, Dr.
25 Roberts testifies: "The security check process does take some time, this has not even
26 been a question."  ECF No. 76 ¶ 38; *Sims* ECF No. 57-7 ¶ 37.  In arguing that
27 liability has already been established, he asserts further: "The security check process
28 is NOT a natural part of a normal commute to or from work."  ECF No. 76 ¶ 39;

7    Case No. 2:20-cv-10719-JFW (SKx)
DEFENDANT'S RESPONSE AND OBJECTIONS TO DECLARATION OF
WILLIAM W. ROBERTS, PH.D. IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

47879869_5.docx

1  *Sims* ECF No. 57-7 ¶ 38.  These verbatim quotes demonstrate that Dr. Roberts did
2  not independently construct his report in support of Plaintiff's motion for class
3  certification based on the facts of this case, but rather, Dr. Roberts relied upon
4  general assumptions concerning security check practices learned during his work on
5  the *Sims* case.  But such assumptions can carry no weight in this case.

6       As Dr. Roberts' invoices show, he became involved in this case less than 10
7  days before his report was finalized and submitted.  CE7, Roberts Dep. 19:18-20:20,
8  Ex. 37; 21:9-25.  For this reason, it is possible that Dr. Roberts had no choice <u>but to</u>
9  recycle his previous work product from the *Sims* matter, though that does not excuse
10 his actions (and inactions).  Alternatively, Dr. Roberts did have time to develop a
11 questionnaire and could have prepared one that was actually appropriate for this
12 case, but chose not to do so.  Either way, the Roberts Report, which is transparently
13 not geared towards this matter, does not fit "the facts of the case" as is required for
14 admission under FRE 702.

15      **B.**   **<u>The Record Indicates That Security Practices At FXG and UPS Are Not "Very Similar," Thus Undermining Dr. Roberts' Opinions.</u>**
16

17      While the Court should not be obligated to compare the facts in this matter to
18 those in the *Sims* litigation, it is already apparent that FXG's security practices are—
19 Dr. Roberts' protestations to the contrary—not "very similar" to the practices at issue
20 in *Sims*.

21      **1.**   **FXG Has Paid For Potential Security Check Time For Most Of The Proposed Class Period.**
22

23      Dr. Roberts acknowledges that FXG has, for the majority of the proposed class
24 period, paid its employees flat amounts for potential security check time.  CE7,
25 Roberts Dep. 61:17-62:16.  This contrasts to the *Sims* case, with Dr. Roberts
26 testifying that he could "not recall UPS paying for any security check time."  *Id.* at
27 18:22-19:1; *see also Sims*, ECF No. 57-1 p. 1 ("[UPS] admits that it has never
28 compensated any of the class members for the time that the employees go through

8   Case No. 2:20-cv-10719-JFW (SKx)
DEFENDANT'S RESPONSE AND OBJECTIONS TO DECLARATION OF
WILLIAM W. ROBERTS, PH.D. IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

47879869_5.docx

1  the mandatory screening process."). Despite this significant difference, Dr. Roberts'
2  proposed cover letter and questionnaire continue to track the previous work product
3  from *Sims* and <u>never</u> mention the fact that any FXG recipient was likely already paid
4  for alleged security check time. *See id.* at 62:17-64:14.

5        This omission is significant and exacerbates other problems with Dr. Roberts'
6  proposed questionnaire. To determine liability, Dr. Roberts must, at a minimum,
7  compare a respondent's claimed security check time against the amounts already
8  paid by FXG, since otherwise, no wages are owed. *See, e.g., Jimenez v. Allstate Ins.*
9  *Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014). Even if Dr. Roberts could do that,
10 however, the <u>questionnaire responses</u> will still be tainted by this omission. Dr.
11 Roberts' proposed cover letter already is deficient because it notifies recipients that
12 they are "potential class members" in a class action lawsuit involving "the security
13 check process at the beginning and end of [their] shift[s]." ECF No. 76 p. 37;
14 *Gibson v. City of Riverside*, 181 F. Supp. 2d 1057, 1068-1069 (C.D. Cal. Jan. 4,
15 2002) (excluding survey where notice to respondents about involvement in class
16 action). Not only are the recipients thus informed "they would be potential
17 beneficiaries of such a lawsuit" which "undermines any possible inference that the
18 survey responses were objective," they are primed to (incorrectly) believe that FXG
19 has <u>never</u> paid them for any claimed security check time. *Sirko v. Int'l Business*
20 *Machines Corp.*, 2014 WL 4452699, at *4 (C.D. Cal. Sept. 3, 2014).

21       As FXG's expert explains, "there is a financial incentive to overestimate
22 security delay time, especially if they are uncertain of their estimate some
23 respondents may consciously or unconsciously bias their estimates upwards.
24 Further, Dr. Roberts' proposed survey and cover letter fails to reference that FedEx
25 has paid thousands of members of the proposed class, whether they had any security
26 delay time or not. Thus, the survey as drafted will create the false impression for
27 many respondents that they may have security check time that was uncompensated,
28 but in reality do not." Declaration of Robert Crandall, MBA, ¶ 67.

One does not need a Ph.D. or MBA to know that FXG's payment of security check pay is a significant fact that should have been disclosed in any cover letter or questionnaire about this case.

### 2. Dr. Roberts Does Not Account For The Lack Of Uniformity In FXG's Security Check Policy And Practices.

Another way in which Dr. Roberts has inexplicably tied his opinions to the previous and unrelated *Sims* litigation is his failure to account for wide divergences in security checks at FXG.

As explained in greater detail in FXG's Opposition to Plaintiff's Motion for Class Certification, there is no "uniform" security check policy or practice at FXG. Rather, FXG's policies provide potential methods that local facilities "may" choose to implement; whether a screen occurs, to whom it applies, and what it involves varies by location. Dozens of declarations submitted by FXG prove this; employees attest that their facility had no security process, that the process did not apply to certain employees or certain shifts, that it changed over time, or that it otherwise did not impact them. *See* FXG's Opposition to Plaintiff's Motion for Class Certification II(B)-(C).

Dr. Roberts concedes that the security check process (if any) differs by FXG's California facility, and that such variation could impact questionnaire responses. CE7, Roberts Dep. 150:17-151:3. He further admits that he does not possess any understanding for how those security check practice might vary between locations. *Id.* at 151:23-152:9.

Given the significant gaps in Dr. Roberts' knowledge and the conceded difference between locations and attendant impact on responses, the proposed questionnaire should have sought to solicit information relevant to liability, including asking the respondents <u>whether</u> there was a security check practice at the employee's location, and, if so, <u>what</u> it involved. Instead, Dr. Roberts mindlessly recycled the *Sims* questionnaire in this matter without making any such changes, again priming

respondents to confirm that security processes took "3 to 5 minutes" without obtaining even basic foundational information.

Once again, Dr. Roberts only deviates from his previous work in the *Sims* case to disadvantage FXG, since there he at least distinguished between "large" and "small" company facilities.  Here, Dr. Roberts fails to tailor the questionnaire to the facts of the case.  The questionnaire does not propose any distinction, by size, location, or security check practice at FXG locations. CE7, Roberts Dep. 151:4-152:9.

## III. CONCLUSION

For all of the reasons asserted above, the Robert Report, including its proposal to use a tainted questionnaire to establish liability and damages, should be disregarded as it considers Plaintiff's Motion for Class Certification.

## IV. SPECIFIC EVIDENTIARY OBJECTIONS

| **Material Objected To:** | **Evidentiary Objection** | **Ruling** |
|---|---|---|
| Roberts Report ¶ 12: "It is my understanding that much of the data necessary for the analysis related to the claims in this case can be made available from company business and policy records, company time and wage records and the records from third parties. It is my belief these records should be sufficient and enable us to calculate most of the damages and applicable | FRE 602 / 703 – Lacks Foundation. | ___ Sustained<br>___ Overruled |

| | | |
|---|---|---|
| penalties." | | |
| Roberts Report ¶ 38: "The security check process does take some time, this has not even been a question." | FRE 602 / 703 – Lacks Foundation. FRE 704 – Improper Legal Conclusion. | ___ Sustained<br>___ Overruled |
| Roberts Report ¶ 39: "The security check process is NOT a natural part of a normal commute to or from work. It is an artificial, potential road jam that could extend and possibly vary the time it takes to arrive at the login to work location." | FRE 602 / 703 – Lacks Foundation. FRE 704 – Improper Legal Conclusion. | ___ Sustained<br>___ Overruled |
| Roberts Report ¶ 39: "This additional time is incurred for the benefit of Defendant by ensuring that inappropriate items are not being taken into the workplace and to help prevent having items be inappropriately removed from the facility. | FRE 602 / 703 – Lacks Foundation. FRE 704 – Improper Legal Conclusion. | ___ Sustained<br>___ Overruled |
| Roberts Report ¶ 40: "FEDEX has apparently made the decision that security wait time is compensable and has (*sic*) making some flat sum payments per punch multipled by the | FRE 602 / 703 – Lacks Foundation. FRE 704 – Improper Legal Conclusion. | ___ Sustained<br>___ Overruled |

| number of punches per shift. | | |

DATED: July 26, 2021    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.


By: /s/ Alexander M. Chemers
    Evan R. Moses
    Alexander M. Chemers
    Melis Atalay

Attorneys for Defendant
FEDEX GROUND PACKAGE SYSTEM, INC.

47879869.5

47879869_5.docx

13   Case No. 2:20-cv-10719-JFW (SKx)
DEFENDANT'S RESPONSE AND OBJECTIONS TO DECLARATION OF
WILLIAM W. ROBERTS, PH.D. IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION